[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-13552

_____

D.C. Docket No. 1:14-cv-00594-CG-M

CHRISTINE J. WILLIAMS,

                                                Plaintiff - Appellant,

versus

POARCH BAND OF CREEK INDIANS,

                                                Defendant - Appellee

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(October 18, 2016)

Before ED CARNES, Chief Judge, JORDAN, Circuit Judge, and SMITH,* District
Judge.

_____

        * Honorable C. Lynwood Smith, Jr., United States District Judge for the Northern District
of Alabama, sitting by designation.

SMITH, District Judge:

Christine J. Williams, the plaintiff below and appellant here, was employed for more than twenty-one years as the laboratory manager and chief medical technologist in the Health Department operated by the Poarch Band of Creek Indians ("the Poarch Band"), a federally-recognized tribe of Native Americans.[1]  The Department is located on reservation lands, and positions within it are considered to be jobs of Tribal government.[2]  Plaintiff asserts that her employment was terminated because of her age (which she described as "over 55"), and that she was replaced by a 28-year-old female who "did not have enough experience to be a lab manager."[3]  Plaintiff subsequently filed a complaint in the United States District Court for the Southern District of Alabama, alleging a single claim of discrimination under the Age Discrimination in

---

[1] Additional Principal Brief for Plaintiff-Appellant, at 4.  *See also, e.g.*, 25 U.S.C. § 479a-1 (requiring that the Secretary of the U.S. Department of the Interior annually "publish in the Federal Register a list of all Indian tribes which the Secretary recognizes to be eligible for the special programs and services provided by the United States to Indians because of their status as Indians"); 81 Fed. Reg. 26826 (listing 567 Tribal entities that were recognized, as of May 4, 2016, as eligible for funding and services from the Bureau of Indian Affairs by virtue of their status as Indian Tribes); *id.* at 26829 (listing the Poarch Band, previously described as "the Poarch Band of Creek Indians of Alabama"); 80 Fed. Reg. 1942-43 (notice publishing a list of 566 tribal entities that were recognized and eligible, as of Jan. 14, 2015, for funding and services from the Bureau of Indian Affairs by virtue of their status as Indian tribes); *id.* at 1945 (listing the Poarch Band, previously described as "the Poarch Band of Creek Indians of Alabama").  *See also, e.g.*, http://www.poarchcreekindians.org/westminster/index.html (last visited Sept. 26, 2016).

[2] Tr. doc. no. 11-1 (Declaration of Tribal Administrator Edie Jackson), at 2.

[3] Tr. doc. no. 5 (Executed Complaint), at 1.  Note:  The *pro se* complaint filed by plaintiff on Dec. 22, 2014 (Tr. doc. no. 1) was not signed, and the Magistrate Judge to whom the case originally was assigned ordered her to file an executed copy in accordance with Fed. R. Civ. P. 11(a).  That pleading was filed on January 6, 2015.

Employment Act of 1967, 29 U.S.C. §§ 621-634 ("ADEA"). The Poarch Band moved to dismiss the suit, arguing that the doctrine of tribal sovereign immunity deprived the court of subject matter jurisdiction. The Magistrate Judge to whom the action originally was assigned entered a report recommending that the motion be granted.[4] Plaintiff's objections were overruled by the District Court Judge, who adopted the Magistrate's Report and Recommendation and dismissed the case.[5] This appeal followed. Following review and with the benefit of oral arguments, we affirm.

## I. STANDARD OF REVIEW

We review the legal conclusions underlying a district court's dismissal of claims under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction *de novo*,[6] and its findings of jurisdictional facts for clear error. *See, e.g.*, *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1328 (11th Cir. 2013). "The burden for establishing federal subject matter jurisdiction rests with the party bringing the claim." *Sweet Pea Marine Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1247 (11th Cir. 2005) (citation omitted). If the plaintiff fails to shoulder that burden, the case must be dismissed. *E.g.*, *In re Trusted Net Media Holdings, LLC*, 550 F.3d 1035,

---

[4] Tr. doc. no. 25 (Report and Recommendation), at 18.

[5] *See* Tr. doc. no. 26 (Plaintiff's Objections to Magistrate's Report and Recommendation); Tr. doc. no. 28 (Order of U.S. District Judge Callie V.S. Granade, adopting Magistrate Judge's Report and Recommendation); Tr. doc. no. 29 (July 8, 2015 Judgment in Favor of the Poarch Band).

[6] Fed. R. Civ. P. 12(b)(1) provides that: "Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion: (1) lack of subject-matter jurisdiction . . . ."

1042 (11th Cir. 2008) ("[I]f the court determines that subject matter jurisdiction is lacking, it must dismiss the entire case.") (alteration supplied).

## II. DISCUSSION

The principle that American Indian tribes possess "sovereignty" — that they are a group of people bound together by ties of common heritage, exercising dominion over a defined geographical area, and possessing the fundamental right of self-government through the enactment and enforcement of substantive laws within that territory — is a precept that preceded the creation of the United States government.[7] That belief is reflected in statements made by Alexander McGillivray, the principal chief of the "Upper Creek" confederation from 1782 until his death in 1793.[8] McGillivray pushed to centralize Creek authority in the present states of Alabama and

---

[7] *See, e.g.*, Andrea M. Seielstad, *The Recognition and Evolution of Tribal Sovereign Immunity Under Federal Law: Legal, Historical, and Normative Reflections on a Fundamental Aspect of American Indian Sovereignty*, 37 TULSA L. REV. 661 (2002); Theresa R. Wilson, *Nations Within a Nation: The Evolution of Tribal Immunity*, 24 AMER. INDIAN L. REV. 99 (1999). The principle of tribal sovereignty is implicit in the term chosen by those European governments that established colonies in the "New World" to describe agreements reached between the European settlers and the indigenous people on the North American continent: *i.e.*, "treaties," a term universally used to describe understandings that are "formally signed, ratified, or adhered to between two nations or sovereigns." BLACK'S LAW DICTIONARY 1640 (9th ed. 2009).

[8] McGillivray was born about 1750 in the Creek (*Muscogee*) town (*talwa*) of Little Tallassee, located near present-day Montgomery. His birth name was either *Hippo Ilk Meco* ("the Good Child King") or *Hoboi Hili Miko* ("Great Beloved Man"). Virginia Pounds Brown & Linda McNair Cohen, DRAWING BY STEALTH: JOHN TRUMBULL AND THE CREEK INDIANS 33-35 (Montgomery: New South Books 2016); *see also id.* at *ix* (observing that the variant spellings of Creek Indian names of people and places "reflect the wrenching of Muskogean sounds into archaic French, Spanish, and English spellings over several centuries and thus into the research materials that scholars on the subject have left us").

4

Georgia.[9]  Following the 1783 Treaty of Paris that formally ended the American Revolution, he authored a letter on behalf of the Creek, Chickasaw, and Cherokee Indian nations that angrily protested the nascent American government's assertion of title to — as well as the English Monarchy's cession of — "*our lands*":

> We Cheifs and Warriors of the Creek Chickesaw and Cherokee Nations, do hereby in the most solemn manner *protest against any title claim or demand the American Congress may set up for or against our lands, Settlements, and hunting Grounds in Consequence of the Said treaty of peace between the King of Great Brittain and the States of America* declaring that as we were not partys, so we are determined to pay no attention to the Manner in which the British Negotiators has drawn out the Lines of the Lands in question Ceded to the States of America — it being a Notorious fact known to the Americans, known to every person who is in any ways conversant in, or acquainted with American affairs, that *his Brittannick Majesty was never possessed either by session purchase or by right of Conquest of our Territorys and which the Said treaty gives away*.  On the contrary it is well known that *from the first Settlement of the English colonys of Carolina and Georgia up to the date of the Said treaty no title has ever been or pretended to be made by his Brittanic Majesty to our lands except what was obtained by free Gift or by purchase for good and valuable Considerations*.

John Walton Caughey, *McGillivray of the Creeks* 91 (Norman:   University of Oklahoma Press 1938) (1959 Reprint) (misspellings in original, emphasis supplied).

---

[9] *See* Edwin C. Bridges, *Alabama:  The Making of an American State* 24 (Tuscaloosa:  Univ. of Ala. Press 2016) (Map depicting the principal Indian towns and trading paths in the Southeast just before the American Revolution, with state boundary lines superimposed, and showing that Creeks claimed most of present-day Alabama and Georgia); *id.* at 24-36 (discussing the Creeks in the land that became the State of Alabama).

McGillivray's mixed-race heritage and experiences[10] molded him into "a literate and erudite bicultural Creek"[11] — a man whose superior negotiation skills earned him the title of "the Talleyrand of Alabama"[12] after leading a delegation of thirty powerful Creek chiefs and warriors to New York City, the first capitol of George Washington's fledgling government, during July of 1790.  There he negotiated with Secretary of War Henry Knox the first treaty ratified under the new Constitution.  McGillivray insisted that "sovereignty was one of the Indian nations' 'natural rights . . . which belong[ed] to our ancestors and hath descended from them to us Since the beginning of time.'"[13]  The resulting "Treaty of New York," as it became known to history,

> optimistically established "perpetual peace and friendship" between America and the entire Creek nation and settled the boundary between the state of Georgia and the Creeks, with the Creeks agreeing to give up

---

[10] McGillivray's mother, Sehoy, belonged to the powerful Creek "Wind Clan" (*Hutalgalgi*), and his father, Lachlan McGillivray, was a Scot trader.  Creek society was matrilineal, which meant that Alexander's heritage was traced through his mother's family line rather than his father's, and he was considered ethnically to be a Creek.  *See, e.g.*, Gregory A. Waselkov, A CONQUERING SPIRIT: FORT MIMS AND THE REDSTICK WAR OF 1813-1814, at 13-14 (Tuscaloosa:  Univ. of Ala. Press 2006).  He spent the first six years of his life immersed in Creek society, under the guidance of his mother and members of her clan.  His father later moved him into colonial society in Augusta, Georgia, where he learned firsthand the language, manners, and "many of the details of plantation life. . . .  In 1773, Alexander moved to Charleston, South Carolina, where he studied under his cousin Reverend Farquhar McGillivray and then briefly took an apprenticeship at the countinghouse of Samuel Elbert in Savannah, Georgia."  Andrew K. Frank, *Alexander McGillivray*, ENCYCLOPEDIA OF ALABAMA, http://www.encyclopediaofalabama.org/article/h-2313 (ellipsis supplied) (last visited Oct. 4, 2016).

[11] Kathryn H. Braund, *The Creeks Take New York*, 122 ALABAMA HERITAGE 10, Fall 2016.

[12] Brown and Cohen, *supra* note 8, at 31.

[13] Christina Snyder, SLAVERY IN INDIAN COUNTRY:  THE CHANGING FACE OF CAPTIVITY IN EARLY AMERICA 163 (Cambridge:  Harvard Univ. Press 2010) (ellipsis and alteration in original, footnote omitted).

roughly two-thirds of the land Georgia had claimed under the previous treaties.  The Creeks also promised to return prisoners taken during the border conflicts of the 1780s.  In exchange for the territory, the Creeks received a perpetual annuity of $1,500 as well as a gift of trade goods and other items.  *The nation-to-nation relationship and respect for tribal sovereignty* was a continuation of British policy established in the eighteenth century, which took Indian affairs out of the hands of the colonies and centralized them in the hands of an imperial "Indian department."  The exclusive right of the United States to treat with Indian tribes (as opposed to individual states) was embedded in the Constitution.

Kathryn H. Braund, *The Creeks Take New York*, 122 Alabama Heritage 19, Fall 2016

(emphasis supplied).[14]

McGillivray's insistence that the federal government acknowledge the existence of Native American sovereignty has been reflected in numerous decisions of the United States Supreme Court.  *See, e.g.*, *Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 509 (1991) ("Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories.") (quoting *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831)); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55-56 (1978) (stating that

---

[14] Braund's statement that the "exclusive right of the United States to treat with Indian tribes (as opposed to individual states) was embedded in the Constitution" is a shorthand reference to Article I's Commerce Clause, which provides that "Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes . . ." U.S. Const. art. I, § 8, cl. 3 (1788).  That is the only mention of Indian *tribes* in the Constitution. Individual Indians are referenced in art. I, § 2, cl. 3, which addresses the apportionment of elected representatives and direct taxes among the several states "according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons."

Indian tribes "have power to make their own substantive law in internal matters, and to enforce that law in their own forums") (citations omitted); *United States v. Mazurie*, 419 U.S. 544, 557 (1975) ("Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory."); *United States v. Kagama*, 118 U.S. 375, 381-82 (1886) (observing that Indian tribes are "a separate people, with the power of regulating their internal and social relations"); *Worchester v. Georgia*, 31 U.S. (6 Pet.) 515, 559 (1832) (holding that Indian tribes are "distinct, independent political communities, retaining their original natural rights" in matters of self-government).

For such reasons, Indian tribes benefit from the same "common-law immunity from suit traditionally enjoyed by sovereign powers." *Santa Clara Pueblo*, 436 U.S. at 58 (citations omitted). Even so, that immunity is not absolute, but subject to the plenary power of Congress to limit, modify, or eliminate altogether. *See, e.g.*, *Oklahoma Tax Commission*, 498 U.S. at 510 ("Congress has always been at liberty to dispense with such tribal immunity or to limit it."); *Talton v. Mayes*, 163 U.S. 376, 384 (1896) ("Indian tribes are subject to the dominant authority of congress.").

Thus, suits such as this one are barred by the doctrine of tribal sovereign immunity, unless the plaintiff shows either a clear waiver of that immunity by the tribe, or an express abrogation of the doctrine by Congress. *See, e.g.*, *Oklahoma Tax*

8

*Commission*, 498 U.S. at 509 (citing *Santa Clara Pueblo*, 436 U.S. at 58); *Kiowa*

*Tribe v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 754 (1998) (holding that "an

Indian tribe is subject to suit only where Congress has authorized the suit or the tribe

has waived its immunity").

There is no evidence that the Poarch Band waived its immunity, either generally

or in the present suit.[15]  Therefore, the Tribe retains its common law exemption from

suit, unless plaintiff demonstrates that Congress abrogated the doctrine of tribal

sovereign immunity when enacting the ADEA.

A.    **Plaintiff's Comparison of the Definitions of the Term "Employer" Found
       in the ADEA and Title VII, in Conjunction With the Supreme Court's
       Opinion in *Fitzpatrick v. Bitzer***

The Poarch Band contends that the text of the ADEA "contains no mention of

tribal immunity at all, much less an express and unequivocal abrogation of tribal

immunity from private lawsuits."[16]  In response, plaintiff argues that a comparison of

the definition of the term "employer" found in Title VII of the Civil Rights Act of

---

[15] For example, § 1-1-1 of the Tribal Code states that the "sovereign immunity of the [Poarch Band] is not waived by any section, part, word, or phrase contained in this Tribal Code or amendments thereto." Tr. doc. no. 11 (Poarch Band's Brief in Support of Motion to Dismiss), at 10 (alteration supplied).  Moreover, § 33-8-9 of the Tribal Employment Rights Code states that: "Nothing contained in this Title shall be construed as a waiver by the [Poarch Band] of sovereign immunity from uncontested lawsuits or as consent by the [Poarch Band] to the bringing of any action against the [Poarch Band], its officers, agents, employees, departments or business entities or enterprises." Tr. doc. no. 11 (Poarch Band's Brief in Support of Motion to Dismiss), at 11 (alterations supplied).

[16] Brief of Defendant-Appellee Poarch Band (submitted in response to the brief drafted by Appellant's appointed counsel), at 11.

1964 with the ADEA's definition of that same term demonstrates that Congress intended to abrogate tribal immunity when enacting the ADEA.[17]

Title VII was enacted on July 2, 1964.  The pertinent part of the Act's original definition of the term "employer" read as follows:

> (b)    The term "employer" means a *person* engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person, *but such term does not include* (1) the United States, a corporation wholly owned by the Government of the United States, *an Indian tribe, or a State or political subdivision thereof*, (2) a bona fide private membership club (other than a labor organization) which is exempt from taxation under section 501(c) of the Internal Revenue Code of 1954: . . .

Pub. L. No. 88-352, § 701(b), 78 Stat. 253-54 (1964) (emphasis and ellipsis supplied).[18]

---

[17] *See* Additional Principal Brief for Plaintiff-Appellant, at 6-10.

[18] Title VII has been amended several times since its enactment, and the current definition of the term "employer" reads as follows:

> (b)    The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person, *but such term does not include* (1) the United States, a corporation wholly owned by the Government of the United States, *an Indian tribe*, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service (as defined in section 2102 of Title 5), or (2) a bona fide private membership club (other than a labor organization) which is exempt from taxation under section 501(c) of Title 26, except that during the first year after March 24, 1972, persons having fewer than twenty-five employees (and their agents) shall not be considered employers.

42 U.S.C. § 2000e(b) (emphasis supplied).

10

The ADEA was enacted three years later, on December 15, 1967, and Congress

*appears* to have patterned that Act's definition of the term "employer" upon Title

VII's formulation.  Thus, the pertinent part of the ADEA provision provides that:

> The term "employer" means a *person* engaged in an industry affecting commerce who has twenty-five or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year:  . . .   The term also means any agent of such person, *but such term does not include* the United States, a corporation wholly owned by the Government of the United States, *or a State or political subdivision thereof*.

Pub. L. No. 90-202, § 11(b), 81 Stat. 605 (1967) (emphasis and ellipsis supplied).

Plaintiff focuses upon Congress's failure to include the phrase "an Indian tribe" in the

list of those entities excluded from the definition of an "employer" for purposes of the

ADEA, and argues that the omission indicates a congressional intent to abrogate tribal

sovereign immunity as a bar to suit under the Act.[19]  Plaintiff relies upon the Supreme

---

[19] *See, e.g.*, Additional Principal Brief for Plaintiff-Appellant, at 7 ("an affirmative act"). Notably, only two of the federal statutes prohibiting workplace discrimination on the basis of an employee's protected characteristic expressly exclude Indian tribes from their definition of the term "employer":  *i.e.*, as discussed *infra*, Title VII of the Civil Rights Act of 1964; and, Title I of the Americans with Disabilities Act of 1990, which defines the term "employer" as follows:

> (A)    **In general**.  The term "employer" means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person, except that, for two years following the effective date of this subchapter, an employer means a person engaged in an industry affecting commerce who has 25 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year, and any agent of such person.

> (B)    **Exceptions**.  *The term "employer" does not include —* (*i*)  The United States, a corporation wholly owned by the government of the United States, or *an Indian tribe*; or (*ii*)  a bona fide private membership club (other than a labor

Court's opinion in *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976), to support her argument. As will be seen, however, that case does not assist her.

The plaintiffs in *Fitzpatrick* were a group of retired male employees of the State of Connecticut who claimed that certain provisions in that State's statutory retirement benefit plan discriminated against them because of their sex and, therefore, violated Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e–2(a)(1) (making it unlawful for an "employer" to discriminate against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin"). As previously noted, however, when Title VII was enacted on July 2, 1964, it expressly exempted "a State or political subdivision thereof" from the definition of those "employers" required to comply with the Act.[20] Moreover, Title VII then defined the term "employee" as meaning simply "an individual employed by an employer." Pub. L. No. 88-352, § 701(f), 78 Stat. 253-54 (1964). As a consequence of the juxtaposition of those two

_____

organization) that is exempt from taxation under section 501(c) of Title 26.

42 U.S.C. § 12111(5) (boldface emphasis in original, italicized emphasis supplied). All other federal employment discrimination statutes are silent on the question of whether Indian tribes are included within the definition of the term "employer" (and, therefore, whether the statutes apply to tribal employers).

[20] See the textual quotation preceding note 16, *supra* (Pub. L. No. 88-352, § 701(b), 78 Stat. 253-54 (1964) (stating that "[t]he term 'employer' . . . does not include . . . a State or political subdivision thereof") (ellipses supplied)).

definitions, the *Fitzpatrick* plaintiffs would not have been eligible to sue the State of Connecticut under the terms of Title VII as originally enacted.

By the date on which the *Fitzpatrick* suit was commenced, however, both of the foregoing definitions had been significantly amended by the Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, 86 Stat. 103-113 (1972). For example, the 1972 Amendments deleted the phrase "a State or political subdivision thereof" from Title VII's definition of the term "employer." *Id.*, § 2(2).[21] In addition, the 1972 Amendments *expanded* the definition of "employee" to *include* persons "subject to the civil service laws of a State government, governmental agency or political subdivision." Pub. L. No. 92-261, § 2(5), 86 Stat. 103 (1972).[22] As a result of those

---

[21] The amended provision, which now is codified at 42 U.S.C. § 2000e(b), reads as follows:

> The term "employer" means a *person* engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person, *but such term does not include* (1) the United States, a corporation wholly owned by the Government of the United States, *an Indian tribe*, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service (as defined in section 2102 of Title 5), or (2) a bona fide private membership club (other than a labor organization) which is exempt from taxation under section 501(c) of Title 26, except that during the first year after March 24, 1972, persons having fewer than twenty-five employees (and their agents) shall not be considered employers. [Emphasis supplied.]

[22] The amended definition of the term "employee," as now codified at 42 U.S.C. § 2000e(f), reads as follows:

> (f)   The term "employee" means an individual employed by an employer, except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the

two amendments — together with a change to Title VII's definition of the term "person"[23] — the *Fitzpatrick* plaintiffs became *statutorily* entitled to sue the State of Connecticut for alleged violations of Title VII.

The gravamen of plaintiff's argument in the present case can be succinctly stated as follows: Because the Supreme Court's opinion in *Fitzpatrick* considered the 1972 Amendment of Title VII that deleted the phrase "a State or political subdivision thereof" from the Act's definition of "employer" sufficient to bring states within the purview of that Act, Congress's failure to include the phrase "an Indian tribe" in the list of entities excluded from the ADEA's definition of "employers" demonstrated a congressional intent to abrogate tribal sovereign immunity as a bar to suit under the Act. Specifically, plaintiff argues that

> Congress can express its will by actions which *delete* words as much as adding them. Its decision to *delete* the word "Indian tribe" from

---

exercise of the constitutional or legal powers of the office. *The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision*. With respect to employment in a foreign country, such term includes an individual who is a citizen of the United States. [Emphasis supplied.]

[23] The Equal Employment Opportunity Act of 1972 *expanded* Title VII's original definition of the term "person" — *i.e.*, "The term 'person' includes one or more individuals, labor unions, partnerships, associations, corporations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in bankruptcies, or receivers" (Pub. L. No. 88-352, § 701(a), 78 Stat. 253 (1964)) — to *include* "governments, governmental agencies, [and] political subdivisions." Pub. L. No. 92-261, § 2(1), 86 Stat. 103-113 (1972) (alteration supplied). The amended definition now reads as follows: "The term "person" includes one or more individuals, *governments, governmental agencies, political subdivisions*, labor unions, partnerships, associations, corporations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11, or receivers. 42 U.S.C. § 2000e(a) (emphasis supplied).

14

the definition of "employer" that it borrowed from Title VII was no different from the equivalent deletion of state governments from that same definition which the Supreme Court held to be sufficient to abrogate the state's immunity from Title VII claims in *Fitzpatrick v. Bitzer*, 417 U.S. 445, 452 (1976). There was no explicit declaration of abrogation in that instance other than the *deletion* of the following words: "The term 'employer' . . . does not include . . . a state or political subdivision." Congress used that same means of abrogating tribal immunity in the ADEA by *deleting* the following words from the definition of "employer" it adopted from Title VII: "The term 'employer . . . does not include . . . an Indian tribe." 42 U.S.C. § 2000e(b). By deciding to include those words in Title VII in 1964 but to *delete* them three years later when it enacted the ADEA on the basis of Title VII, Congress expressed its clear and unmistakable intent to abrogate tribal immunity from suits for age discrimination. That was a deliberate choice by Congress.

Additional Principal Brief for Plaintiff-Appellant, at 8-9 (ellipses in original, footnotes omitted, emphasis supplied). Plaintiff's argument is not persuasive, for at least three reasons.

First, plaintiff's repeated use of such terms as "delete," "deletion," and "deleting" is improper, because the phrase "an Indian tribe" was never included in the list of entities excluded from the ADEA's definition of those "employers" required to comply with the Act. Hence, the phrase could not have been "deleted." It would have been more correct for plaintiff to say that Congress "omitted," or "failed to include," that phrase when defining the term "employer" for purposes of the ADEA.

Second, and related to the first point, the silence of the statutory text of the ADEA and its legislative history on the issue of whether Congress intended the Act

to apply to Indian tribes is ambiguous.  It certainly is not the "clarion call of clarity" required by our decision in *Freemanville Water Systems v. Poarch Band of Creek Indians*, 563 F.3d 1205 (11th Cir. 2009): *i.e.*, "Indian tribes have sovereign immunity from lawsuits unless Congress has abrogated it in the statute creating the right of action that is asserted against the tribe.   To be effective the expression of Congressional intent must be a *clarion call of clarity.  Ambiguity is the enemy of abrogation.*"   *Id.* at 1206 (emphasis supplied); *see also Florida Paraplegic Association, Inc. v. Miccosukee Tribe of Indians of Florida*, 166 F.3d 1126, 1131 (11th Cir. 1999) (observing that the Supreme Court "has held that Congress may abrogate a sovereign's immunity 'only by making its intention unmistakably clear in the language of the statute'; legislative history and 'inferences from general statutory language' are insufficient") (quoting *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242 (1985)).  Indeed, one could just as easily conclude from the omission of any reference to Indian tribes in the text of the ADEA, related committee reports, or the floor statements of legislators during consideration of the Act that Congress never considered the ADEA's impact upon Indian tribes.

Fundamentally, however, plaintiff's argument misconstrues the central issue addressed in *Fitzpatrick*.  That case turned upon the question of whether Congress possessed the power to abrogate the sovereign immunity enjoyed by the states under

the Eleventh Amendment,[24] and to expose them to suit under Title VII.  The Court

held that the Fourteenth Amendment was enacted specifically to limit the power of the

states and, thereby, that it fundamentally altered the balance of state and federal power

struck by the Constitution.    As a consequence, Section 5 of the Fourteenth

Amendment, the so-called "Enforcement Clause,"[25] vested Congress with the power

to pierce the shield of sovereign immunity afforded the states by the Eleventh

Amendment, and to enter an award against Connecticut for retroactive retirement

benefits as compensation for losses caused by the State's alleged discrimination on the

basis of the plaintiffs' sex.  *See Fitzpatrick*, 427 U.S. at 448.  The 1972 Amendment's

deletion of the phrase "a State or political subdivision thereof" from the list of entities

excluded from Title VII's definition of "employer" was not, *standing alone*,

considered by the Supreme Court to be a clear indication of congressional intent to

abrogate the states' Eleventh Amendment sovereign immunity for purposes of Title

VII actions.  Therefore, *Fitzpatrick* cannot be said to dictate a finding that Congress

---

[24] The Eleventh Amendment provides that:  "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI (1795).  *See also, e.g.*, *Hans v. Louisiana*, 134 U.S. 1, 13-15 (1890) (holding that the Eleventh Amendment not only repudiated the Supreme Court's decision in *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419 (1793), but restored the original understanding of the persons who drafted the Constitution — in Hamilton's phrase, "the plan of the convention" — that a state could not be sued without its consent); *The Federalist*, No. 81, at 487 (Alexander Hamilton) (Clinton Rossiter ed., 1963) (2003 reprint).

[25] "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."  U.S. Const. amend. XIV, § 5 (1868).

intended to abrogate tribal sovereign immunity under the ADEA by *failing to exclude* "an Indian tribe" from the definition of those "employers" that were required to comply with the ADEA.

## B.   Statutes of General Applicability

Plaintiff also attempts to avoid the doctrine of tribal sovereign immunity by emphasizing that the ADEA is a statute of "general applicability," and Congress did not expressly exclude Indian tribes from the Act's coverage.[26]   That argument is foreclosed by our decision in *Florida Paraplegic Association, Inc. v. Miccosukee Tribe of Indians of Florida*, *supra*, which involved a claim of disability discrimination under Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12181 *et seq.* ("ADA").   We held there that, even though the ADA generally *applied to* the Miccosukee Indian Tribe, suits against the Tribe were, nevertheless, barred by the doctrine of tribal sovereign immunity.   *See* 166 F.3d at 1134-35.   Specifically, our opinion stated that:

> A general statute presumptively governs Indian tribes and will apply to them absent some superseding indication that Congress did not intend tribes to be subject to that legislation.   *See Federal Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 120, 80 S. Ct. 543, 556, 4 L. Ed. 2d 584 (1960).   The leading summary of the three circumstances that may defeat the "general statute" presumption is found in a Ninth Circuit case, *Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d 1113 (9th Cir. 1985). As the district court recognized, a general statute applies to Indian tribes unless its application would (1) abrogate

---

[26] Additional Principal Brief for Plaintiff-Appellant, at 12-13.

rights guaranteed under an Indian treaty, (2) interfere with purely intramural matters touching exclusive rights of self-government, or (3) contradict Congress's intent, *see id.* at 1116. The Associations and the Miccosukee Tribe agree that no treaty relevant to this case exists and that Congress has not specifically expressed its intent that the ADA not apply to Indian tribes. Thus, the presumption of applicability controls here unless the Act "touches 'exclusive rights of self-governance in purely intramural matters.'" *Coeur d' Alene*, 751 F.2d at 1116 (quoting *United States v. Farris*, 624 F.2d 890, 893 (9th Cir.1980)).

We agree with the district court and the majority of our sister courts that have applied this test that *tribe-run business enterprises acting in interstate commerce* do not fall under the "self-governance" exception to the rule that general statutes apply to Indian tribes. In *Coeur d'Alene*, the Ninth Circuit explained the limitations of this exception:

> The tribal self-government exception is designed to except purely intramural matters such as conditions of tribal membership, inheritance rules, and domestic relations from the general rule that otherwise applicable federal statutes apply to Indian tribes.

> The operation of a farm that sells produce on the open market and in interstate commerce is not an aspect of tribal self-government. Because the Farm employs non-Indians as well as Indians, and because it is in virtually every respect a normal commercial farming enterprise, we believe that its operation free of federal health and safety regulations is neither profoundly intramural . . . nor essential to self-government.

751 F.2d at 1116 (citations and internal punctuation omitted). The Miccosukee Tribe's restaurant and gaming facility is a commercial enterprise open to non-Indians from which the Tribe intends to profit. The business does not relate to the governmental functions of the Tribe, nor does it operate exclusively within the domain of the Tribe and its members. In fact, it is precisely the sort of facility within "the array of

establishments . . . available to others who do not currently have disabilities" that Congress intended to make "equally accessible" to disabled individuals through enactment of Title III of the ADA. *We hold, therefore, that because the ADA is a generally applicable law and because no exception to the presumption that such statutes apply to Indian tribes controls this case, Title III of the ADA governs the Miccosukee Tribe in its operation of its gaming and restaurant facility.*

The district court ended its consideration of the Tribe's motion to dismiss this lawsuit with its finding that Title III governs Indian tribes and that no exception prevents its application to the Miccosukee Tribe's commercial enterprise. *The analysis does not stop here, however, for whether an Indian tribe is subject to a statute and whether the tribe may be sued for violating the statute are two entirely different questions.* As the Supreme Court bluntly stated in *Kiowa Tribe v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 140 L. Ed. 2d 981, 118 S. Ct. 1700, 1703 (1998), "there is a difference between the right to demand compliance with state laws and the means available to enforce them." This principle, which simply spells out the distinction between a right and a remedy, applies with equal force to federal laws.

*Florida Paraplegic*, 166 F.3d at 1129-30 (emphasis supplied).

The same result pertains in this case. The difference between being subjected to the requirements of a statute and the right to commence a suit demanding compliance with (or damages for violations of) that same statute may be razor-thin, but it is a distinction that has been acknowledged consistently.

Thus, even though the ADEA is a statute of general applicability, and the Poarch Band might be generally subject to its terms, the doctrine of tribal sovereign immunity protects the Poarch Band from suits under the statute.

**C.    The Law in Other Circuits**

Other Circuits that have considered the issue raised by this appeal also have determined that federal courts lack subject-matter jurisdiction over an ADEA claim asserted against a federally-recognized Indian tribe.  For example, the Tenth Circuit has stated:

> We believe that unequivocal Supreme Court precedent dictates that in cases where ambiguity exists (such as that posed by the ADEA's silence with respect to Indians), and there is no *clear* indication of congressional intent to abrogate Indian sovereignty rights (as manifested, *e.g.*, by the legislative history, or the existence of a comprehensive statutory plan), the court is to apply the special canons of construction to the benefit of Indian interests.

*E.E.O.C. v. Cherokee Nation*, 871 F.2d 937, 939 (10th Cir. 1989) (emphasis in original).

The Second Circuit also has held that Congress did not abrogate tribal sovereign immunity under the ADEA.  *See Garcia v. Akwesasne Housing Authority*, 268 F.3d 76, 86 (2d Cir. 2001).  In a recent unpublished opinion that answers plaintiff's argument about comparing Title VII's definition of "employer" to the ADEA's definition of that same term, the Second Circuit upheld a district court's dismissal of the plaintiff's ADEA claim against an Indian tribe, saying that:

> Unlike Title VII's definition of employer, the ADEA's definition of employer does not exclude American Indian tribes.  *Compare* 42 U.S.C. § 2000e(b) (Title VII), *with* 29 U.S.C. § 630(b) (ADEA).  Nonetheless, "[a]s a matter of federal common law, an Indian tribe

21

enjoys sovereign immunity from suit except where 'Congress has authorized the suit or the tribe has waived its immunity.'" *Garcia*, 268 F.3d at 84 (quoting *Kiowa Tribe v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 754, 118 S. Ct. 1700, 140 L. Ed. 2d 981 (1998)). Agencies of a tribe enjoy "the same presumption of immunity" in a suit for damages. *Id.*; *see also Bassett v. Mashantucket Pequot Tribe*, 204 F.3d 343, 358 (2d Cir. 2000). The Supreme Court has explained that, "[t]o abrogate tribal immunity, Congress must unequivocally express that purpose," and "to relinquish its immunity, a tribe's waiver must be clear." *C&L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 532 U.S. 411, 418, 121 S. Ct. 1589, 149 L. Ed. 2d 623 (2001) (internal quotation marks omitted). Congress has not unequivocally expressed its purpose to abrogate tribal sovereign immunity pursuant to the ADEA, *Garcia*, 268 F.3d at 86, nor has plaintiff identified any applicable waiver of immunity from such suits in federal court. Accordingly, tribal sovereign immunity barred Tremblay's ADEA claim.

*Tremblay v. Mohegan Sun Casino*, 599 F. App'x 25, 26 (2d Cir. 2015) (alterations in original).

The Eighth Circuit also has held that no evidence of a congressional intent to abrogate tribal sovereign immunity can be drawn from a comparison of Title VII's definition of "employer" to the ADEA's definition of that same term:

Although the two provisions [*i.e.*, the original definitions of "employer" in Title VII and the ADEA] are generally similar, differences do exist. Under ordinary canons of construction, the omission of the phrase "an Indian tribe" in the ADEA in comparison with its inclusion in Title VII could be construed as indicating that Indian tribes were intended to be covered by the ADEA . . . . *United States v. Dion*[, 476 U.S. 734, 739-40 (1986)] . . . , however, indicates that some affirmative evidence of congressional intent, either in the language of the statute or its legislative history, is required to find the requisite "clear and plain" intent to apply the statute to Indian tribes. Furthermore, ambiguities of

> congressional intent must be resolved in favor of the tribal sovereignty
> . . . . Because of the special rules of construction that apply in a case such
> as this, we do not find that a clear and plain intention of Congress should
> be extrapolated from the omission of the phrase "an Indian tribe" from
> the definition of "employer" in the ADEA.

*EEOC v. Fond du Lac Heavy Equipment and Construction Co.*, 986 F.2d 246, 250-51

(8th Cir. 1993) (alterations and ellipses supplied).[27]

Plaintiff responds that the foregoing opinions contained "strongly reasoned

dissents," and did not consider the Supreme Court's holding in *Fitzpatrick v. Bitzer*,

427 U.S. 445 (1976).[28] Even so, this court should not give more weight to a dissenting

opinion than to a majority decision. Moreover, as previously discussed, *Fitzpatrick*

is not helpful to plaintiff.

Thus, the weight of authority in federal courts supports upholding the right of

the Poarch Band to tribal sovereign immunity from a claim based upon the ADEA.

### III. CONCLUSION

For the foregoing reasons, we find that the Poarch Band is entitled to tribal

sovereign immunity from plaintiff's ADEA claim. Accordingly, we affirm the district

---

[27] Several district courts also have held that Congress has not abrogated tribal sovereign immunity under the ADEA. *See, e.g.*, *Bales v. Chickasaw Nation Industries*, 606 F. Supp. 2d 1299, 1308 (D. N.M. 2009) ("Congress did not abrogate tribal sovereign immunity when it enacted the ADEA."); *Colmar v. Jackson Band of Miwuk Indians*, No. CIV S-09-0742 DAD, 2011 WL 2456628 (E.D. Cal. June 15, 2011) (holding in the context of an ADEA claim that an Indian tribe's sovereign immunity had not been abrogated by Congress, and subject matter jurisdiction did not exist).

[28] Additional Principal Brief for Plaintiff-Appellant, at 18.

court's decision to grant the Poarch Band's motion to dismiss for lack of subject-

matter jurisdiction.

**AFFIRMED**.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

October 18, 2016

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 15-13552-CC
Case Style: Christine Williams v. Poarch Band of Creek Indians
District Court Docket No: 1:14-cv-00594-CG-M

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against appellant.

The Bill of Costs form is available on the internet at www.ca11.uscourts.gov

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Joe Caruso, CC at (404) 335-6177.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs